## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MONOLITHIC POWER SYSTEMS, INC., a Delaware Corporation,<br><br>          Plaintiff,<br><br>     v.<br><br>VICOR CORPORATION, a Delaware corporation<br><br>          Defendant. | C.A. No.: _____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Monolithic Power Systems, Inc. ("MPS" or "Plaintiff") files this Complaint against Vicor Corporation ("Vicor" or "Defendant") and hereby alleges as follows:

## THE NATURE OF THE ACTION

1.     This is a civil action for patent infringement.

2.     MPS is a world leader in the design, development, marketing, and sale of power semiconductor products, including power management solutions, such as power converter modules for use in, e.g., computer systems, datacenters and artificial intelligence (AI) centers. Founded in 1997, MPS has achieved significant growth year over year and great financial success due to its unmatched technical innovation and ability to offer high-performance products at scale, including power converter modules, while providing superior customer support. MPS's mission is to reduce total energy consumption in its customers' systems with practical, energy-efficient solutions. And through decades of innovation, MPS has amassed a large patent portfolio related to power distribution, power conversion topologies, power control systems, and power module technology, including U.S. Patent No. 9,684,745 ("the Asserted Patent"), which relates to a method

to configure settings on voltage regulators including through use of a graphic user interface ("GUI"). A true and correct copy of the Asserted Patent is attached hereto as Exhibit 1.

3.    Vicor competes against MPS for customers of power converter modules, including power modules that are designed for the same applications as MPS's products.   During the design-in phase for a customer's product under development, MPS and its competitors seek to get their power solutions, such as their power converter products, designed in the customer's board implementation for that product under development.  Given the typically short design-in timelines that are required by customers due to the intense pressures for those customers to get their products to market, especially for artificial intelligence (AI) and datacenter applications, MPS utilizes patented software configuration tools so that it (and its customers) can configure and calibrate the settings of MPS power converters on the customer's board implementation.  MPS's patented software configuration tools allow MPS (and its customers) to meet these deadlines, and contribute to MPS obtaining design-ins for its power converters, which in the end, when the customer's product is mass produced, results in significant sales of those power converters that are programmed with those calibrated settings.

4.    On information and belief, during the design-in phase with its customers, Vicor utilizes, and makes available to its customers, an infringing Power System Configurator ("PSC") tool, and similar tools, for configuring the settings on Vicor power modules. Vicor has infringed and continues to infringe the Asserted Patent by making, using, selling, or offering for sale within the United States, and/or importing into the United States the PSC tool, and similar tools, including power modules configured using the PSC tool (the "Accused Products"), and induces others to do the same.

## THE PARTIES

5.      MPS is a corporation organized and existing under the laws of Delaware.

6.      Upon information and belief, Vicor is a corporation organized and existing under the laws of Delaware with its principal place of business at 25 Frontage Road, Andover, Massachusetts 01810.

## SUBJECT MATTER JURISDICTION

7.      This court has subject matter jurisdiction over the patent infringement claims asserted in this case under 28 U.S.C. §§ 1331 and 1338(a).

## PERSONAL JURISDICTION, VENUE, AND JOINDER

8.      This Court has personal jurisdiction over Vicor as a citizen/resident of Delaware. On information and belief, the Court further has personal jurisdiction over Vicor; because Vicor has regularly conducted and continues to conduct business in the United States, in the State of Delaware, and in this judicial district. On information and belief, Vicor has committed infringing activities in Delaware and in this judicial district by making, using, offering for sale, and/or selling in the United States and/or importing into the United States, power modules and systems configured with the PSC tool that infringe upon the Asserted Patent, or by placing such infringing power modules and systems into the stream of commerce with the awareness, knowledge, and intent that they would be used, offered for sale, or sold by others in this judicial district and/or purchased by consumers in this district.

9.      Venue is proper as to Vicor pursuant to 28 U.S.C. §§ 1391(b) and 1400(b) because it is a citizen/resident of Delaware and has committed, and continues to commit, acts of infringement in this District and has a regular and established place of business in this District.

10.     Vicor is subject to this Court's general and/or specific jurisdiction pursuant to due process and/or the Delaware Long Arm Statute due at least to Vicor's substantial business in Delaware, because Defendant has and does conduct regular business in Delaware and/or because Defendant has engaged in persistent conduct and/or has derived substantial revenues from goods and services provided to customers in Delaware.

## THE ASSERTED PATENT

11.     On June 20, 2017, the U.S. Patent and Trademark Office duly and legally issued U.S. Patent No. 9,684,745, entitled "Digitally Calibrated Voltage Regulators for Power Management," listing Eric Yang and Michael Hsing as the inventors, from a patent application filed on November 30, 2016. The Asserted Patent claims priority to application number 13/791,480 filed on March 8, 2013, which ultimately claims priority to provisional application No. 61/712,659, filed on Oct. 11, 2012.

12.     The claims of the Asserted Patent are an improvement in computer-implemented voltage-regulator configuration technology. The invention includes a specific sequence that solves technical problems in the prior art, namely the manual, difficult, and engineer-intensive calibration of power-management integrated circuits through physical bench-tests. The Asserted Patent provides for specialized computer architecture and a corresponding programmable regulator architecture.

13.     The Asserted Patent describes a "virtual bench" that provides a technical user environment for configuring and testing a particular voltage-regulator design. The virtual bench can display virtual representations of the regulator and related laboratory equipment, including a power supply, oscilloscope, output inductor, output capacitor, and load, and can display resulting graphical data such as Bode plots. This GUI is therefore part of a specialized technical interface

that improves computer-based regulator design by allowing the user to configure and validate regulator behavior in a virtual environment that corresponds to actual circuit operation. The GUI described by the patent is the front end of a regulator-specific simulation and calibration platform.

14. The Asserted Patent further describes selecting technical regulator parameters such as output voltage, switching frequency, protection thresholds, component values, and other circuit-related operating requirements. These selections include engineering parameters that determine how the voltage regulator core operates. This improves prior-art configuration systems because, instead of relying on manual tuning and physical rework by experienced engineers, the claimed system permits parameter entry directly into a computer tool that is specifically configured to derive corresponding internal settings for the regulator.

15. The Asserted Patent also describes a "simulation engine" that receives the selected requirements and determines the resulting behavior of the regulator using equations, tabular data, and application design guidelines for the specific regulator. The simulation engine may consult a "knowledge base" that reflects expert knowledge of the regulator, including knowledge of its designers and field application engineers. Such an improvement allows for a specially programmed interface to perform simulations for various devices. The computer may technically model the expected operation of the regulator based on regulator-specific internal settings and design knowledge.

16. The Asserted Patent further explains that the internal calibration setting includes configuring the device to operate in a certain manner. Settings such as digital calibration bits or other internal settings may be downloadable to the regulator over a communication link. This transmission step allows for the physical integrated circuit to be programmed in accordance with the simulated design.

17.     The Asserted Patent recites a particular technological improvement in computer systems for simulation and configuration of voltage regulators and in the way such computers interact with programmable power-management hardware. The Asserted Patent addresses a problem arising in the technical field of voltage-regulator calibration, uses a specialized computer environment described in the specification, and produces a concrete hardware-calibration result through transmission and implementation of internal calibration settings in the regulator itself. Hence, the solution offered by the Asserted Patent is based on a specific technical solution that was not known as of the date of the invention and is an improvement over the prior art. In the Notice of Allowance dated March 14, 2017, the Examiner cited to the steps recited in the claims of the Asserted Patent, including their claimed combination as "not be[ing] found, taught or suggested by the prior art of record."

18.     MPS exclusively owns all rights, title, and interest in the Asserted Patent necessary to bring this action, including the right to recover past and future damages.

19.     Vicor is not licensed to practice the Asserted Patent.

20.     The Asserted Patent is valid and enforceable.

## FACTUAL BACKGROUND

21.     MPS was co-founded in 1997 by Michael Hsing in Los Gatos, California, USA.

22.     Since its founding, MPS has become an industry-leading fabless semiconductor company that designs, develops, markets, and sells power semiconductor products, including power converter products, for use in, e.g., boards, modules, systems, or servers for AI/datacenters.

23.     MPS has achieved significant growth year over year and great financial success due to its unmatched technical innovation and customer support. MPS has a large patent portfolio covering its power semiconductor products, including its power converter products, which are

particularly important for AI, which requires enormous computing power.  As the demand for AI increases, the demand for efficient delivery of power to run the numerous computer systems housed in AI and datacenters also increases for MPS's patented technologies, and its power converter products. MPS includes notices such as "patent protected" on the datasheets that MPS provides to its customers and potential customers.

## INFRINGEMENT

24.     Vicor has infringed and continues to infringe by utilizing the PSC tool in an infringing manner and inducing others to do the same, including Vicor's customers. For example, Vicor utilizes the PSC tool to configure accused power modules. In doing so, Vicor will test, simulate, and refine parameters of the accused power modules to configure their settings for use in Vicor's customers' board implementations of their products under development, and then Vicor will program all subsequently fabricated accused power modules with those settings for use in the customers' product, which are used in, e.g., AI/datacenters.

25.     Exhibit 2 demonstrates how the accused power modules may be configured in an infringing manner by the PSC tool, and is incorporated here by reference.

26.     As one example, on information and belief, Vicor provides accused power modules to customers for use in, e.g., boards, modules, systems, or servers manufactured for use in AI/datacenters in the United States. In such an example, Vicor uses the PSC tool to configure an accused power module for a customer's board implementation of a product under development, such as boards, modules, systems or servers for used in AI/datacenters in the United States. Vicor will then transmit the determined configuration setting to the accused power modules that are subsequently manufactured for use with downstream customer's products.

27.     On information and belief, Vicor manufactures the accused power modules in, or around, Andover, MA at its module fabrication facilities.

28.     Vicor markets and sells accused power modules both directly through its own marketing and sales force and website, and, on information and belief, indirectly through a network of independent sales representatives and at least five distributors: Arrow Electronics, Inc.; Digi-Key Corporation; Avnet Electronics; Mouser Electronics, Inc.; and Macnica Galaxy Inc.

29.     Vicor maintains sales offices in the United States to sell Vicor accused power modules.

30.     On information and belief, Vicor assists its customers with the evaluation and testing of the accused power modules on Vicor evaluation boards and also assists its customers with the evaluation and testing of the accused power modules on its customers' board implementations for their products in the United States and elsewhere utilizing the PSC tool in order to obtain design-in wins.  Specifically, on information and belief, Vicor field application engineers ("FAEs") based in the United States and elsewhere provide technical support to Vicor's customers in the U.S. and elsewhere, including, e.g., the utilization of the PSC tool, and Vicor's product development engineers and application engineers located, e.g., at Vicor's headquarters in Massachusetts, further support Vicor's FAEs and customers, in order to obtain design-in wins, and an important aspect of that process is the use of Vicor's PSC tool.

31.     On information and belief, Vicor, itself, or in concert with its authorized distributors, causes or induces others, such as contract manufacturers or end customers to incorporate the accused power modules in their products, such as boards, modules, systems, or servers for use in AI/datacenters, by utilizing the PSC tool, that are then made, used, offered to be sold, or sold

within the United States, or imported into the United States with the settings obtained from use of the PSC tool.

32.    Vicor actively induces infringement by directing its customers to use the PSC tool in an infringing manner to configure the accused power modules. For example, Vicor provides a user guide instructing users on how to utilize the PSC tool in an infringing manner. *See* www.vicorpower.com/documents/user_guides/ug-602-PowerSystemConfigurator-VICOR.pdf.

33.    Further, in concert with its authorized distributors and customers, Vicor causes or induces infringing accused power modules to be made, used, offered to be sold, sold within the United States, or imported into the United States with the settings obtained from use of the PSC tool.

34.    Upon information and belief, Vicor has had knowledge of the Asserted Patent since its issuance, because, as an active competitor to MPS, Vicor would have periodically investigated MPS's patent portfolio, particularly, on or about, the time of Vicor's decision to assert its patents against its competitors, such as Delta Electronics and MPS.  At the very least, Vicor has had knowledge of the Asserted Patent as of the filing of this Complaint.

35.    Vicor's infringement has been and continues to be willful.

36.    Upon information and belief, the Accused Products are in relevant part substantially similar to the exemplary infringement shown in Exhibit 2.  Exhibit 2 is thus illustrative of the manner in which each of the Accused Products meets the claim limitations of the Asserted Patent.

### COUNT I: INFRINGEMENT OF U.S. PATENT NO. 9,684,745

37.    MPS incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint and exhibits attached hereto as if fully set forth herein.

38.     The following allegations are based on publicly available information and a reasonable investigation of the structure and operation of the Accused Products. MPS reserves the right to modify this description, including, for example, on the basis of information about the Accused Products that it obtains during discovery.

39.     Vicor's infringement has damaged and continues to damage MPS in an amount yet to be determined, of at least a reasonable royalty.

40.     Vicor has directly infringed the Asserted Patent under 35 U.S.C. § 271(a).  As alleged above and shown in Exhibit 2, use of the PSC tool with each of the accused power modules, including programming each subsequently manufactured accused power module with the calibration settings, meets each and every one of the claim limitations of at least one claim of the Asserted Patent.

41.     As alleged above, Vicor has infringed and continues to infringe at least one claim of the Asserted Patent by making, using, offering to sell, selling within the United States, or importing into the United States the PSC tool with each of the accused power modules, including programming each manufactured accused power module with the calibrated settings.

42.     Vicor's infringement is and continues to be willful.

43.     As alleged above, Vicor has actively induced infringement under 35 U.S.C. §§ 271(b), 271(f)(1) and § 271(g) of at least one claim of the Asserted Patent.  Specifically, Vicor understands, intends, and encourages its accused power modules to be incorporated into downstream products developed by Vicor's end-customers through the use of its PSC tool, such as by incorporating the accused power modules, into boards, modules, systems or servers for use in AI/datacenters, with the calibrated settings obtained from use of the PSC tool.  Vicor encourages end-customers to use the PSC tool in an infringing manner to configure the accused power

modules, which Vicor then sells to customers, either directly or indirectly, or through a supply chain.

44.    Vicor also makes accused power modules configured with calibration settings derived from infringing use of the PSC tool. For example, after Vicor or its customer derives a calibration setting through use of the PSC tool, one or more accused power modules are subsequently similarly configured with such calibration settings.

45.    As alleged above, Vicor has actively contributed to infringement under 35 U.S.C. §§ 271(c), 271(f)(1), and § 271(g) of at least one claim of the Asserted Patent, because the Accused Products constitute a material part of the infringing functionality of the Asserted Patent, and the accused power modules are knowingly made in an infringing manner through infringing use of the PSC tool. The Accused Products are not a staple article or commodity of commerce suitable for substantial non-infringing use.

46.    As a consequence of such infringement, MPS has suffered and will continue to suffer irreparable harm and injury, for example, in the form of lost sales, lost profits and loss of market share. Unless enjoined, Vicor and/or others acting on behalf of Vicor will continue their infringing acts, thereby causing additional irreparable injury to MPS for which there is no adequate remedy at law. Specifically, Vicor's actions will irreparably harm MPS's position in the power converter market by causing MPS to lose customers.

## DAMAGES

47.    As a result of these acts of infringement, MPS has suffered and continues to suffer actual and consequential damages. However, MPS does not yet know the full extent of the infringement and the amount of damages cannot be ascertained except through discovery and special accounting. To the fullest extent permitted by law, MPS seeks recovery of damages at least

for reasonable royalties, lost profits, unjust enrichment, and benefits received as a result of using the patented technology.  MPS further seeks any other damages to which MPS is entitled under law or in equity, including enhanced damages for willful infringement.

## DEMAND FOR JURY TRIAL

48.    MPS hereby demands a jury trial for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, MPS respectfully requests that this Court enter judgment in its favor as follows:

A.    That Judgment be entered that Defendant has infringed one or more claims of the Asserted Patent, literally and/or under the doctrine of equivalents;

B.    That, in accordance with 35 U.S.C. § 283, Defendant and all its affiliates, employees, agents, officers, directors, attorneys, successors, and assigns and all those acting on behalf of or in active concert or participation with any of them, be preliminarily and permanently enjoined from (1) infringing the Asserted Patent and (2) making, using, selling, and offering for sale within the United States, or importing into the United States the Accused Products;

C.    That MPS be awarded damages sufficient to compensate MPS for Defendant's infringement and enhanced damages under 35 U.S.C. § 284, and an accounting of lost sales not presented at trial and an award of additional damages for any such lost sales;

D.    That the case be found exceptional under 35 U.S.C. § 285 and that MPS be awarded its reasonable attorneys' fees;

E.    That MPS be awarded its costs and expenses in this action;

F.    That MPS be awarded damages for pre-issuance infringement under 35 U.S.C. § 154(d);

G.       That MPS be awarded prejudgment and post-judgment interest; and

H.       Such other and further relief as the Court may deem just and proper.

ASHBY & GEDDES

*/s/ John G. Day*

_____

*Of Counsel:*

John P. Schnurer
Kevin Patariu
Miguel J. Bombach
Ray Wu
FOLEY & LARDNER LLP
11988 El Camino Real, Suite 400
San Diego, CA 92130
(858) 847-6700
john.schnurer@foley.com
kevin.patariu@foley.com
miguel.bombach@foley.com
ray.wu@foley.com

Michael Manookin
Ray Nelson
FOLEY & LARDNER LLP
95 S State Street, Suite 2500
Salt Lake City, UT 84111
(801) 401-8900
mmanookin@foley.com
srnelson@foley.com

Dated:  May 4, 2026

John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
jday@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Plaintiff*
*Monolithic Power Systems, Inc.*

{02228001;v1 }

13